CASE NO. 13-cv-00562 (GBD)

# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

ALDO ISMAEL PEREZ,

*Appellant,*

v.

TERRESTAR CORPORATION, *et. al*,

*Debtors-Appellees.*

On Appeal from the United States Bankruptcy Court
for the Southern District of New York

*In re TerreStar Corporation, et al.*,[1]
Case No. 11-10612 (SHL) (Jointly Administered)

## OPENING BRIEF OF DEBTORS-APPELLEES
## IN RESPONSE TO APPELLANT'S OPENING BRIEF

Ira S. Dizengoff
Arik Preis
Joseph L. Sorkin
AKIN GUMP STRAUSS HAUER
& FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Sarah Link Schultz
AKIN GUMP STRAUSS HAUER
& FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
(214) 969-2800 (Telephone)
(214) 969-4343 (Facsimile)

*Counsel for Debtors-Appellees TerreStar Corporation, et al.*

DATED: June 17, 2013

---

[1]The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal taxpayer-identification number, are: (a) TerreStar Corporation [6127] and TerreStar Holdings Inc. [0778] (collectively, the "February Debtors"); and (b) TerreStar New York Inc. [6394]; Motient Communications Inc. [3833]; Motient Holdings Inc. [6634]; Motient License Inc. [2431]; Motient Services Inc. [5106]; Motient Ventures Holding Inc. [6191]; and MVH Holdings Inc. [9756] (collectively, the "Other TSC Debtors" and, collectively with the February Debtors, the "TSC Debtors").

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT...........................................................................1

FACTUAL BACKGROUND ............................................................................2

    A.    Parties..................................................................................2
           1.    The TSC Debtors .....................................................2
           2.    Appellant ................................................................3

    B.    Overview of the TerreStar Chapter 11 Cases ...............................3

    C.    Substantial Consummation of the TSC Debtors' Plan ..................5

    D.    Appellant's Request for an Examiner and Appeal .......................6
           2.    The District Court's Dismissal of the Examiner Appeal as Equitably Moot ....................................................8

    E.    The Instant Appeal ...................................................................10

ARGUMENT ...............................................................................................10

    I.    THE APPEAL SHOULD BE DISMISSED AS MOOT BECAUSE THE PLAN HAS BEEN SUBSTANTIALLY CONSUMMATED ...............10

    A.    An Appeal of a Bankruptcy Court Order Must Be Dismissed if the Appeal Is Constitutionally or Equitably Moot...........................11

    B.    The Plan Has Been Substantially Consummated...................13

    C.    Appellant Cannot Meet *Any* of the Five *Chateaugay* Factors to Overcome the Presumption of Equitable Mootness...................13
           1.    There Is No Effective Relief the Court Can Order.......................13
           2.    Even if the Court Could Order Some Relief, Such Relief Would Be Inequitable and Irreparably Destructive.......................14
           3.    Appellant Did Not Provide Notice of the Appeal to the Parties that Would be Adversely Affected. ...................................17
           4.    Appellant Did Not Diligently Pursue All Available Remedies to Obtain a Stay of Execution of the Plan. ...................18

    II.    THE APPEAL SHOULD BE DISMISSED ON THE MERITS ...........18

    A.    Standard of Review.............................................................18

    B.    Appellant Improperly Raises Arguments for the First Time on Appeal .............................................................................19

    C.    The Bankruptcy Court Did Not Err in Confirming the Plan...................19
           1.    Appellant Provides No Basis for His Argument the Plan was Not Proposed in Good Faith, Pursuant to Bankruptcy Code Section 1129(a)(3). .............................................19
           2.    The Plan Satisfies the Best Interest of Creditors Test of Bankruptcy Code Section 1129(a)(7) ...........................20

3.  The Requirement That at Least One Impaired Class Vote
    for the Plan Under Bankruptcy Code Section 1129(A)(10)
    Was Met. ....................................................................................21

    i.    Bridge Loan Claims ...........................................................21

    ii.   TSC General Unsecured Claims .......................................23

4.  The Plan Meets the Requirements of Bankruptcy Code
    Section 1129(b) that the Plan Be Fair and Equitable and
    Not Unfairly Discriminate. ........................................................24

CONCLUSION .....................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<small>CASES</small>

*In re Adelphia Comm'ns Corp.,*
    342 B.R. 122 (S.D.N.Y. 2006)................................................................................18

*In re A. Tarricone, Inc.,*
    286 B.R. 256 (Bankr. S.D.N.Y. 2002)...................................................................22

*In re Best Prods. Co.,*
    177 B.R. 791 (S.D.N.Y. 1995)..............................................................................12

*In re Buttonwood Partners, Ltd.,*
    111 B.R. 57 (Bankr. S.D.N.Y. 1990).....................................................................24

*In re Calise,*
    354 F. A'ppx 510 (2d Cir. 2009) ....................................................................11, 12

*In re Calpine,*
    390 B.R. 508 (S.D.N.Y. 2008)........................................................................12, 18

*In re Charter Commc'ns, Inc.,*
    691 F.3d 476 (2d Cir 2012)............................................................................11, 16

*In re Chas. P. Young Co.*
    145 B.R. 131 (Bankr. S.D.N.Y. 1992)...................................................................22

*In re Chateaugay Corp.,*
    10 F.3d 944 (2d. Cir. 1993)........................................................................8, 12, 13

*In re Chateaugay Corp.,*
    988 F.2d 322 (2d. Cir. 1993).................................................................................11

*In re Delta,*
    374 B.R. 516 (S.D.N.Y. 2007)..............................................................................13

*In re Duval Manor Assocs.,*
    191 B.R. 622 (Bankr. E.D. Pa. 1996) ...................................................................21

*In re Fort Ann Express, Inc.,*
    226 B.R. 746 (Bankr. N.D.N.Y. 1998) .................................................................22

*In re Gaston & Snow,*
    Nos. 93-cv-8517, 8528 (JGK), 1996 WL 694421 (S.D.N.Y. Dec. 4, 1996) ...........20

*In re Great Bay Hotel & Casino, Inc.,*
    251 B.R. 213 (Bankr. D.N.J. 2000) ......................................................................21

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)................................................................................19

*In re Lehman Bros. Holdings, Inc.*,
    No. 12-cv-5621 (GBD), 2013 WL 820243 (S.D.N.Y. Mar. 5, 2013).....................19

*In re McKenna*,
    238 F.3d 186 (2d Cir. 2001)...............................................................................19

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005)..........................................................................12, 18

*In re Patrician St. Joseph Partners Ltd. P'ship*,
    169 B.R. 669 (D. Ariz. 1994).............................................................................21

*In re S. Beach Sec. Inc.*,
    376 B.R. 881 (Bankr. N.D. Ill. 2007)..................................................................22

*In re Texaco*,
    92 B.R. 38 (S.D.N.Y. 1988)...........................................................................11, 12

*In re UVAS Farming Corp.*,
    89 B.R. 889 (Bankr. D.N.M. 1988) ....................................................................22

*In re Village at Camp Bowie I, L.P.*,
    710 F.3d 239 (5th Cir. 2013) ..............................................................................24

*In re Windsor on the River Assocs.*,
    7 F.3d 127 (8th Cir. 1993) .................................................................................24

*In re WorldCom, Inc.*,
    No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003)...................24

## STATUTES

11 U.S.C. 1127(b) ......................................................................................................14

Bankruptcy Code
    § 1101.............................................................................................................9, 14, 24
    § 1104(c)(1) ..........................................................................................................8
    § 1122(b)...............................................................................................................26
    § 1129................................................................................................................ passim

## OTHER AUTHORITIES

Fed. R. Bankr. P. 8013 ...............................................................................................20

## PRELIMINARY STATEMENT

Aldo Perez ("Appellant"), a former holder of the common stock of TerreStar Corporation ("TSC") prior to its reorganization, asks this Court to overturn the order of the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") confirming the plan of reorganization of the TSC Debtors (the "Confirmation Order"). Appellant's opposition to confirmation is rooted in his disagreement with the Bankruptcy Court's denial of Appellant's request to appoint an examiner to investigate the value of the TSC Debtors' estates and certain unsubstantiated allegations of misconduct. Appellant's disagreement with that decision was the subject of a separate appeal before the District Court of the Southern District of New York (the "Examiner Appeal"), Case No. 12-cv-00857 (RA), which the Court found was equitably moot because the TSC Debtors' plan of reorganization was substantially consummated. Such substantial consummation gives rise to a presumption that an appeal that would require the plan of reorganization to be unwound is equitably moot. Appellant failed to overcome the presumption, and the Examiner Appeal was dismissed.

In this appeal, Appellant seeks essentially the same relief he sought in the Examiner Appeal. The TSC Debtors' plan of reorganization is no less substantially consummated now than it was when the Court dismissed the Examiner Appeal—if anything, there have been additional developments that would render any reversal of the Confirmation Order more difficult and more inequitable than at the time of the Examiner Appeal. The relief Appellant is seeking would require costly unwinding of intricate transactions, clawing back payments to creditors, and jeopardizing the rights of the TSC Debtors' stakeholders. To the extent that such unwinding is even possible, doing so would create a chaotic, uncontrollable situation for the Bankruptcy Court and the TSC Debtors.

Moreover, Appellant improperly raises arguments that the Plan does not meet the requirements of section 1129 of chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") for the first time in this appeal.  Because Appellant did not make any such arguments before the Bankruptcy Court, he cannot now make them for the first time before this Court.

In addition, Appellant's arguments in opposition to the Confirmation Order are based on a misunderstanding of the facts and misapplication of the Bankruptcy Code.  Appellant offers nothing to suggest that the Bankruptcy Court misapplied the law or abused its discretion when it approved the TSC Debtors' plan of reorganization.  For these reasons, the appeal is equitably moot, procedurally improper, meritless, and should be dismissed.

## FACTUAL BACKGROUND

**A.    Parties**

   **1.    The TSC Debtors**

TSC was the parent of wholesale mobile voice and data service provider TerreStar Networks Inc. ("TSN") and a group of affiliated companies operating in the satellite and cellular telecommunications market.  On October 19, 2010, TSN and certain of its affiliates each filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court.  *In re TerreStar Networks Inc., et al.*, Case No. 10-15446 (SHL).

On February 16, 2011, certain of the TSC Debtors, including TSC and TerreStar Holdings Inc., filed a voluntary petition under chapter 11 of the Bankruptcy Code.  On February 23, 2011, the Bankruptcy Court entered orders providing for joint administration of the chapter 11 cases of the TSC Debtors (including TSC, TerreStar Holdings Inc. and certain debtors that initially filed for bankruptcy in October 2010) for procedural purposes only, styled *In re TerreStar Corporation, et al.*, Case No. 11-10612 (SHL).[2]

---

[2] References to documents filed in the TSC Debtors' bankruptcy cases will include the documents' title or name (as defined herein) and the Bankruptcy Court docket number.

2.      **Appellant**

Appellant formerly held shares of common equity in TSC and purported to be a creditor of

TSC.  Appellant filed claims on account of his equity interest in TSC against the TSC Debtors'

estates in a total amount of $165,950.  The Bankruptcy Court expunged this "claim" by an order

dated August 26, 2011 [Bankr. Docket No. 176].

**B.      Overview of the TerreStar Chapter 11 Cases**

Prior to the chapter 11 cases, the TSC Debtors' management and their major stakeholders

worked to develop the terms of a plan of reorganization.  The plan was developed and modified

during the chapter 11 cases to address the TSC Debtors' settlement of disputes with their major

unsecured claimants and other developments in the TSC Debtors' cases.[3]

The confirmed version of the Plan contemplated certain restructuring transactions supported

by the TSC Debtors' largest preferred shareholders (the "Preferred Shareholders").  The Plan

provided that holders of TSC Series A and B preferred shares would receive common stock in the

---

[3] The TSC Debtors filed the initial versions of their joint chapter 11 plan and disclosure statement on July 22, 2011 and August 3, 2011, respectively [Bankr. Docket Nos. 141 and 149].  On January 12, 2012, the TSC Debtors filed amended versions of the plan [Bankr. Docket No. 336] (the "Second Amended Plan") and the disclosure statement [Bankr. Docket No. 338] (the "Second Amended Disclosure Statement").

On January 17, 2012, the Bankruptcy Court approved the adequacy of the Second Amended Disclosure Statement and related materials and established February 24, 2012 as the deadline for parties to vote on the Second Amended Plan [Bankr. Docket No. 343].  Accordingly, on January 25, 2012, the TSC Debtors commenced solicitation of votes to accept or reject the Second Amended Plan from holders of certain claims and equity interests (the "Voting Classes").  Holders of equity interests in Classes 8c – 8e and 9a (including Appellant) were impaired and not entitled to receive property under the Plan, and thus were deemed to reject the Plan.

On June 27, 2012, the TSC Debtors filed a further revised plan [Bankr. Docket No. 513] (the "Third Amended Plan" and together with previous versions of the plan, the "Plan") and a supplement to the Second Amended Disclosure Statement [Bankr. Docket No. 515], which the TSC Debtors amended on August 10, 2012 [Bankr. Docket No. 564] (as amended, the "Disclosure Statement Supplement").  On August 24, 2012, the Bankruptcy Court entered an order [Bankr. Docket No. 591] (the "Supplemental Disclosure Statement Order") approving the adequacy of the Disclosure Statement Supplement and establishing September 28, 2012 as the deadline for certain holders of claims and equity interests (the "Supplemental Voting Classes") to vote to accept or reject the Third Amended Plan.  Because the treatment of certain classes under the Third Amended Plan was identical to the treatment of such classes under the Second Amended Plan, the TSC Debtors did not resolicit such Classes.

On August 29, 2012, the TSC Debtors commenced solicitation of votes to accept or reject the Third Amended Plan.  On October 3, 2012, GCG filed a declaration certifying that Classes 3a, 3b, 4a, 8a and 8b voted to accept the Plan and Class 4f voted to reject the Plan [Bankr. Docket No. 645].  On October 24, 2012, the Bankruptcy Court entered an order confirming the Plan [Bankr. Docket No. 668].

reorganized TSC entity ("Reorganized TSC"), and holders of unsecured claims would receive notes or cash payments.[4]

Several common shareholders objected to the Plan, including Appellant [Bankr. Docket Nos. 556, 607, 638, 639, 661, 664] (collectively, the "Perez Objections").  Additionally, Appellant joined another common shareholder, Jeffrey Swarts, in voicing his objections to the Plan at the confirmation hearing (the "Confirmation Hearing").[5]  *See* Oct. 10, 2012 H'rg Tr., Bankr. Docket No. 675.  Such objections largely centered around the valuation of the TSC Debtors' assets and the fact that the Plan did not provide for a recovery to TSC's common shareholders.

At the confirmation hearing, the TSC Debtors presented the valuation analysis and liquidation analysis [Bankr. Docket No. 569] (the "Liquidation Analysis") prepared by Blackstone Advisory Partners L.P. ("Blackstone") and the declaration of Steven Zelin [Bankr. Docket No. 650, Ex. B] (the "Zelin Declaration").  The Bankruptcy Court entered these documents into evidence. Oct. 10, 2012 H'rg Tr. at 19-20, Bankr. Docket No. 675.  Additionally, Zelin testified in support of confirmation and was subject to cross-examination by both Jeffrey Swarts and Appellant.  *Id.*, at 50-93.  In his declaration and on the record, Zelin stated, among other things, that:

- The TSC Debtors had retained RKF Engineering Solutions, LLC ("RKF") to analyze potential uses of the 1.4 GHz spectrum (the TSC Debtors' largest asset).

- In light of RKF's recommendations in connection therewith and Blackstone's independent analysis, Blackstone estimated the value of the spectrum to be between $160 million and $235 million.

- For common equity holders to receive any recovery, the value of the spectrum would need to exceed $515 million, which amount would increase by $1.8 million per month due to amounts accruing to the preferred shareholders.

*See id.*, at 33-34, 73; Zelin Decl., Bankr. Docket No. 650, Ex. B at 6-8, 13-14.

---

[4]Alternatively, the Plan contemplated that in the event of a sale of substantially all of the TSC Debtors' assets, the TSC Debtors would pay unsecured claims in cash in full and distribute any remaining sale proceeds to Preferred Shareholders.  However, no such sale ultimately occurred.

[5] In all proceedings before the Bankruptcy Court, Appellant appeared on behalf of himself only.

### C.     Substantial Consummation of the TSC Debtors' Plan

In the months following confirmation of the Plan, the TSC Debtors worked to consummate the Plan, including preparing the requisite FCC application, finalizing the exit financing facility, and performing the restructuring transactions pursuant to the Plan.  In addition, following confirmation of the Plan, the TSC Debtors and the Preferred Shareholders settled various unsecured claims, including the largest remaining unsecured claim held by Van Vlissingen & Co.

On March 7, 2013, the Plan "went effective," culminating in the closing of the transactions contemplated by the Plan.  *Declaration of Douglas Brandon* (the "Brandon Decl."), ¶ 6.[6]  In connection with or following the occurrence of the Effective Date, the following transactions occurred:

- Reorganized TSC emerged as a new corporation, pursuant to an amended and restated certificate of incorporation filed with the Delaware Secretary of State.  *Id*., ¶ 7.  Reorganized TSC is a private, nonreporting company and is authorized to issue 2,000 shares of common stock (the "New Common Stock").  *Id*.

- The TSC Debtors' common and preferred stock was canceled, and holders of TSC Series A and B preferred shares[7] had the right to receive shares of New Common Stock in proportion to their Series A and B preferred stock holdings.  *Id*.  Reorganized TSC sent all such holders a Notice of Distribution informing them of their rights and of the steps necessary to claim their shares and to become party to Reorganized TSC's new Registration Rights Agreement.  *Id*.  The process of the issuance of New Common Stock was initiated for holders of Series A and B preferred shares.  *Id*.

- Certain of the TSC Debtors merged into Motient Holdings Inc.; Motient Ventures Holding Inc. merged into MVH Holdings Inc.; and Motient Communications Inc. was converted to a limited liability company.  *Id*.

- With certain exceptions provided in the Plan, the property of each TSC Debtor's estate was transferred to each respective reorganized TSC entity, free and clear of liens, claims and other encumbrances or restrictions.  *Id*.  (Together with the emergence of Reorganized TSC, the "Restructuring Transactions.")

---

[6] The Plan provides that the "Effective Date" will occur when certain transactions and events necessary to implement the Plan have taken place.  The Plan further provides that, upon the Effective Date, certain transactions contemplated by the Plan will occur or will be deemed to have occurred.

[7] The TSC Series A and B preferred shares were held by approximately 30 holders.

- The bylaws of Reorganized TSC went into effect. *Id*.

- On March 7, 2013, the new Board of Directors of Reorganized TSC resolved to appoint a transfer agent and paying agent with respect to the issuance of the New Common Stock and approve the form of stock certificate for the New Common Stock. *Id*.

- On March 26, 2013, the new Board of Directors had its first official meeting, and the new Chief Executive Officer and Secretary of Reorganized TSC took office. *Id*.

- Reorganized TSC has procured $10 million in directors and officers insurance and recently contracted with FirstEnergy to extend the existing lease on the 1.4 GHz spectrum, which expired at the end of May 2013, for an additional two years. *Id*.

- On March 7, 2013, Reorganized TSC filed an 8-K stating that Reorganized TSC had emerged from bankruptcy, that all shares previously outstanding were canceled, and that the company would issue New Common Stock. *Id*. Accordingly, Reorganized TSC applied for and obtained a CUSIP for the New Common Stock. *Id*.

- On March 13, 2013, FINRA delisted TSC's stock and issued an advisory notice acknowledging that equity interests in TSC were canceled and that holders of Series A and B preferred shares would receive New Common Stock. *Id*.

- The FCC consented to the transfer of control of TerreStar 1.4 Holdings LLC,[8] which holds the license to use the 1.4 GHz terrestrial spectrum, from pre-Effective Date TSC to Reorganized TSC. *Id*. Reorganized TSC then filed a notice of consummation, informing the FCC that the transfer was effective. *Id*.

- Reorganized TSC entered into an approximately $27.3 million senior secured term loan. Reorganized TSC then made distributions to creditors, including cash payments of approximately $6.3 million. This included a payment of approximately $4.4 million to repay a "Bridge Loan" provided by certain investors in November 2010.

**D.    Appellant's Request for an Examiner and Appeal**

Appellant argues that the Bankruptcy Court should have appointed an examiner to conduct an independent valuation of the TSC Debtors' assets and to investigate purported misconduct of the TSC Debtors and their investors. Appellant's request for appointment of an examiner was addressed on numerous occasions before the Bankruptcy Court and was the subject of the Examiner Appeal. While the TSC Debtors believe that the Bankruptcy Court's denial of appointment of an

---

[8] TSC's primary asset is its equity interest in TerreStar 1.4 Holdings LLC. TerreStar 1.4 Holdings LLC was not a chapter 11 debtor.

examiner has already been addressed and is not a proper basis for an appeal of the Confirmation

Order, the TSC Debtors are providing background on these efforts for context.

### 1.     The Bankruptcy Court's Rejection of the Request for Examiner

Appellant requested, and was denied, appointment of an examiner to investigate valuation of

the TSC Debtors' assets and certain alleged misconduct in multiple pleadings before the

Bankruptcy Court. *See, e.g.*, Bankr. Docket Nos. 216 (the "Examiner Request"); 232 (the "Motion

for Reconsideration"); 287 ("Nov. 16, 2011 H'rg Tr.").  In each instance, Appellant made

unsubstantiated assertions regarding the value of the 1.4 GHz spectrum and purported improper

business dealings with then holders of TSC preferred stock.   *See generally*, Examiner Request,

Bankr. Docket No. 216; Nov. 16, 2011 H'rg Tr., Bankr. Docket No. 287 at 37–46, 60–63.  Each

time, the Bankruptcy Court considered Appellant's arguments, it determined that appointment of an

examiner was not in the interest of creditors, equity holders and the estate under Bankruptcy Code

section 1104(c)(1).  *See* Sept. 21, 2011 Tel. Conf. Tr., Bankr. Docket No. 246 at 7–12; Nov. 16,

2011 H'rg Tr., Bankr. Docket No. 287 at 67–72.  In support of this finding, the Bankruptcy Court

noted that Appellant presented little to no factual support for Appellant's allegations of fraud and

misconduct.  *See* Nov. 16, 2011 H'rg Tr., Bankr. Docket No. 287, at 72–73.  With respect to

valuation, the Bankruptcy Court agreed with the TSC Debtors' position that valuation of the TSC

Debtors' assets was not an appropriate topic for an examiner's investigation and was an issue

properly reserved a confirmation hearing.  *See id*. at 68; *see also* Sept. 21, 2011 Tel. Conf. Tr.,

Bankr. Docket No. 246 at 10–11.  Additionally, common shareholders were so far "out of the

money" that any additional value uncovered by an examiner would be unlikely to provide them

with any recovery because all secured and unsecured creditors and holders of all five series of TSC

preferred stock would have to be paid before common shareholders could recover anything.  *See*

Sept. 21, 2011 Tel. Conf. Tr., Bankr. Docket No. 246 at 11  .

**2.     The District Court's Dismissal of the Examiner Appeal as Equitably Moot**

On February 3, 2012, Appellant initiated the Examiner Appeal.  After a six-month delay in which Appellant made no attempt to pursue the appeal, followed by a series of extensions, Appellant filed an opening brief on February 14, 2013 [Examiner Appeal Docket No. 16].[9]

On April 24, 2013, the district court dismissed the appeal as equitably moot [Examiner Appeal Docket No. 33 (the "Examiner Appeal Op.")].  The court found that the TSC Debtors had provided evidence that was "more than sufficient to support a finding that the Plan has been substantially consummated within the meaning of section 1101 of the Bankruptcy Code." Examiner Appeal Op. at 8.  The court then noted that substantial consummation of the Plan gave rise to a presumption that an appeal that would cause the Plan to be unwound would be equitably moot.  *Id*.  The court further found that the relief Appellant was seeking in the Examiner Appeal would require unwinding of the Plan, and that Appellant had failed to meet four of the five factors required under *In re Chateaugay Corp.*, 10 F.3d 944, 952–53 (2d Cir. 1993),[10] to overcome the presumption of equitable mootness.  *Id*. at 9–13.  (With respect to the fifth factor, the court did not make a determination.)

Importantly, the court found that Appellant did not meet the first three *Chateaugay* factors because an examiner's investigation and any resulting revaluation of the TSC Debtors' primary asset "would be ineffective to grant the distribution Perez ultimately seeks, and would require

---

[9] Because the briefing in and dismissal of the Examiner Appeal (Case No. 12-cv-00857 (RA)) did not take place until after the instant appeal was docketed, we respectfully ask the Court to take judicial notice of the proceedings therein.

[10] Under *Chateaugay*, an Appellant may overcome a presumption of mootness by showing:  (1) the court can still order effective relief; (2) such relief will not affect the emergence of the debtor as a revitalized corporate entity; (3) such relief will not unravel intricate transactions so as to create an unmanageable, uncontrollable situation for the Bankruptcy Court; (4) the parties who would be adversely affected have notice of the appeal and an opportunity to participate in the proceedings; and (5) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order.  10 F.3d at 952–53.

unraveling of intricate transactions and cause harm to the vitality of Reorganized TSC." *Id*. at 11.

Specifically, the court found:

> Perez contends that he is seeking a limited investigation for the purpose of an "impartial valuation of the spectrum license(s) owned or controlled by TSC" and the distribution of any value uncovered to unsecured creditors and equity holders, (Appellant's Reply 4), but the Court fails to see how such an investigation and, importantly, any potential revaluation and distribution, could be possible without unwinding transactions and affecting the re-emergence of Reorganized TSC.

> The pre-Effective Date TSC—the entity that Perez seeks to investigate—is no longer in existence, all of its preferred and common stock has been cancelled, and certain preferred shareholders have begun the process of claiming shares of new common stock in Reorganized TSC.  []  Further, at the confirmation hearing, the Bankruptcy Court carefully considered and rejected Perez's arguments regarding valuation of the spectrum license, [] and thereafter confirmed the Plan upon finding that TSC held the asset at a specific value.  Any revaluation by the examiner—whether resulting in a higher or lower value—would ultimately result in a reassessment of the Bankruptcy Court's findings regarding valuation of the Debtors' primary asset in approving the Plan . . . .  Moreover, because the equity interests of common shareholders were cancelled under the Plan, [], a new reorganization plan would have to be negotiated for Perez and other common shareholders to recover any additional value that might be found by the examiner. . . .  In any event, because the secured and unsecured creditors have not been paid in full and must be before the common shareholders can recover under a reorganization plan, Perez is unlikely to receive any additional value that might be distributed, thus rendering his requested relief ineffective. . . .  Furthermore, as previously noted by the Bankruptcy Court, an investigation would be costly to the Debtors. . . .  Thus . . . Perez fails to satisfy the first, second and third *Chateaugay* factors.

*Id*. at 9–11.

In addition, the court found that Appellant failed to meet the fourth *Chateaugay* factor, in

that he did not diligently pursue his appeal or all available remedies to stay the execution of the

Plan.  *Id*. at 11–13.  In addition to failing to file an opening brief in his appeal for over a year, the

court noted that Appellant did not seek a stay of the Confirmation Order.  *Id*. at 12–13.  And while

he sought a stay of the order approving the disclosure statement, when the stay was denied, he

failed to appeal the denial to the District Court.  *Id*. at 13.  Therefore, the court found, "Perez cannot

be said to have pursued with diligence all available remedies" as required to overcome the

presumption of equitable mootness.  *Id*.  Accordingly, the court dismissed the appeal without

reaching the merits and closed the case.  *Id*. at 14.

### E.    The Instant Appeal

On January 25, 2013, Appellant initiated the instant appeal.  In his opening brief, Appellant

argues that the Court should overturn the Plan because the Bankruptcy Court should have appointed

an examiner to investigate alleged misconduct and the valuation of the TSC Debtors' assets prior to

confirmation.  Appellant also argues for the first time that the Plan does not satisfy the requirements

of Bankruptcy Code section 1129.

Appellant seeks relief substantively identical to the relief he sought in connection with the

dismissed Examiner Appeal.  Specifically, Appellant asks the Court to "reverse the Confirmation

Order and to remand this case to the Bankruptcy Court with instructions to order an independent

valuation of all of TSC's assets, including the 1.4 GHz Spectrum and the recovery actions after a

proper investigation, and to require TSC and the Other TSC Debtors to file and solicit acceptance

for another reorganization plan accounting for the independent valuation and investigation."

Appellate Br. at 31.


## ARGUMENT

Appellant argues that the Bankruptcy Court abused its discretion when it confirmed the TSC

Debtors' Plan.  Appellant's arguments must fail:  <u>first</u>, because his appeal is now moot, and <u>second</u>,

because the Bankruptcy Court properly applied the law and did not abuse its discretion in

confirming the Plan.

## I.    THE APPEAL SHOULD BE DISMISSED AS MOOT BECAUSE THE PLAN HAS BEEN SUBSTANTIALLY CONSUMMATED

The Bankruptcy Court confirmed the Plan on October 24, 2012.  Appellant filed his opening

brief in this appeal on May 3, 2013.  In the eight months since confirmation, the Plan has been

10

substantially consummated, and thus, the TSC Debtors have the benefit of the strong presumption that the appeal is moot.  Further, Appellant cannot overcome this presumption because any relief the Court could order— even if possible to effectuate—would be wholly inequitable to all parties. Therefore, the Court should dismiss this appeal on the basis of equitable mootness alone, and need not even reach the merits.

**A.    An Appeal of a Bankruptcy Court Order Must Be Dismissed if the Appeal Is Constitutionally or Equitably Moot.**

The duty of an Article III court is to decide live cases and controversies, "not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."  *In re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir. 1993).  Accordingly, an appeal is constitutionally moot and should be dismissed when events occur while the appeal is pending that would prevent the appellate court from fashioning effective relief.  *Id.*

Further, an appeal in a bankruptcy matter should be dismissed as moot when, even if effective relief could be fashioned, implementation of that relief would be inequitable.  *In re Calise*, 354 F. A'ppx 510, 513 (2d Cir. 2009).  Unlike constitutional mootness, which turns on the question of whether a case or controversy exists, equitable mootness is concerned with whether a remedy can be granted without unjustly upsetting a plan of reorganization.  *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 481 (2d Cir 2012).

The mootness doctrine is "especially pertinent in bankruptcy proceedings, where the ability to achieve finality is essential to the fashioning of effective remedies."  *In re Chateaugay*, 988 F.2d at 325; *In re Texaco*, 92 B.R. 38, 45-46 (S.D.N.Y. 1988) (noting that the mootness doctrine "is rooted firmly in sound notions of public policy and promotes the orderly administration of estates by affording finality to the judgments of the bankruptcy court").  The mootness doctrine is therefore

routinely invoked in appeals of bankruptcy court decisions to avoid disturbing a plan of reorganization that has already been implemented. *In re Calise*, 354 F. App'x at 513; *see also In re Calpine*, 390 B.R. 508, 518 (S.D.N.Y. 2008) (dismissing for mootness); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005) (same).

When a plan of reorganization is "substantially consummated," a presumption arises that an appeal of a bankruptcy court order confirming the plan is equitably moot. *In re Chateaugay Corp.*, 10 F.3d 944, 952 (2d Cir.1993); *In re Texaco*, 92 B.R. at 46. The presumption of mootness is based on the fact that "it is inherently improbable, once there has been substantial consummation, that an appellate court will be able to fashion effective relief." *In re Texaco*, 92 B.R. 38 at 46. This is because "the piecemeal dismantling of the Reorganization Plan in subsequent appeals of individual transactions is, in practical terms if nothing else, a virtually impossible task." *Id*. Courts dismiss appeals for mootness when a plan is substantially consummated and the court cannot fashion a remedy without unwinding the consummated plan. *Id*.; *In re Best Prods. Co.*, 177 B.R. 791, 808 (S.D.N.Y. 1995) (dismissing appeal of subordination agreements that could not be excised from consummated plan without creating "an unmanageable and uncontrollable situation").

An appellant may overcome the presumption of mootness where a plan has been substantially consummated only by demonstrating that five circumstances, established by the Second Circuit in *In re Chateaugay*, are present:

> (a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; ***and*** (e) the appellant diligently pursued all available remedies to obtain a stay of execution of the objectionable order (if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from).

*In re Chateaugay*, 10 F.3d at 952-953 (emphasis added); *In re Delta*, 374 B.R. at 522.  In order to overcome the presumption, Appellant must meet all five *Chateaugay* factors.  *In re Delta*, 374 B.R. 516, 522 (S.D.N.Y. 2007).

**B.     The Plan Has Been Substantially Consummated.**

Bankruptcy Code section 1101(2) provides that a plan of reorganization is "substantially consummated" where there has been:  "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan."  The Bankruptcy Code provides that a plan of reorganization cannot be modified once it is substantially consummated.  11 U.S.C. 1127(b).

As found by the court in the Examiner Appeal, and as described above, the Plan has been substantially consummated.  Among other things:  the TSC Debtor' property has been transferred to the reorganized entities; the process of distributing the New Common Stock is in progress; the Board of Directors of Reorganized TSC has taken official action and management has taken office.  Further, the TSC Debtors have made distributions to substantially all creditors holding allowed claims against the TSC Debtors.  Accordingly, the Court may presume that this appeal and Appellant's requests for relief are equitably moot.

**C.     Appellant Cannot Meet *Any* of the Five *Chateaugay* Factors to Overcome the Presumption of Equitable Mootness.**

**1.     There Is No Effective Relief the Court Can Order.**

Appellant asks the Court to reverse the Confirmation Order and to order an "independent valuation of all of TSC's assets . . . and the recovery actions after a proper investigation" and to require the TSC Debtors to "file and solicit acceptance for another reorganization plan accounting for the independent valuation and investigation."  Appellate Br. at 31.

In seeking an "independent valuation," Appellant seeks the same relief that was denied in the Examiner Appeal.  There, the district court determined that appointing an examiner would be ineffective because, even if an examiner uncovered any value, Appellant and other common shareholders would be unlikely to recover any funds.  Examiner Appeal Op. at 11.  That reasoning holds true here as well:  pursuant to Bankruptcy Code section 1129(2)(b)(ii), TSC common shareholders may not receive a recovery unless creditors of TSC and the holders of preferred shares are paid in full.  As explained in the Zelin Declaration, for that to happen, the total value of the TSC Debtors' assets would have had to be in excess of $515.5 million.  *See* Zelin Decl., Bankr. Docket No. 650, Ex. B at 13-14.  However, the TSC Debtors' advisors' valuation, approved by the Bankruptcy Court, is only between $160 million and $235 million.  *Id.*  Therefore, an examiner would have to uncover, at a minimum, several hundred million dollars in value for Appellant to receive a distribution.  As the court found in the Examiner Appeal, it is unlikely that an examiner could uncover such value.  Thus, appointment of an examiner would be ineffective.

Appellant's prayer that the Court order the TSC Debtors to file and solicit acceptance of a new plan, based on a hypothetical independent investigation of value, is totally improper. Appellant provides no authority—and the TSC Debtors have found none—suggesting that the Court can force the TSC Debtors to take such an action in response to this hypothetical investigation. Further, to the extent Appellant is seeking appointment of an examiner, the findings of an examiner are not binding on **anyone**, and the Debtors thus cannot be required to take any action on the basis of these findings.  The Court cannot order the relief requested.

### 2.   Even if the Court Could Order Some Relief, Such Relief Would Be Inequitable and Irreparably Destructive.

The relief Appellant seeks will result in total unwinding of the transactions that have been consummated pursuant to the Plan, creating an unmanageable, uncontrollable situation for the

Bankruptcy Court, and jeopardizing the TSC Debtors' ability to continue as a revitalized corporate entity.

The relief Appellant seeks would require that the transactions that occurred prior to and since consummation of the Plan would have to be unwound.  To unwind even a few of these transactions would create an unmanageable situation for all parties.  And as the court found when it dismissed the Examiner Appeal, to the extent such unwinding is even possible, it would be highly inequitable to unwind any, let alone all, of these events.  Examiner Appeal Op. at 9–11.  Further, attempting to do so would give rise to complicated legal, financial and operational questions that neither the TSC Debtors nor the Bankruptcy Court is in a position to address.  For instance:

First, unwinding the Plan would require the nullification and reversal of the Restructuring Transactions and the reversion of the reorganized TSC entities to their debtor status.  To that end, among other things, the amended and restated certificate of incorporation and new bylaws for Reorganized TSC would have to be nullified, and the prior certificate of incorporation and bylaws reinstated.  Similarly, the new Board of Directors would be stripped of their titles, their resolutions nullified, and the old Board of Directors reinstated.  In addition, the mergers and dissolutions of the Other TSC Debtors would have to be unwound, and each entity would revert to debtor status.  All property transferred from the TSC Debtors to the reorganized TSC entities would have to be returned to the TSC Debtors as debtors.  The substantive and procedural requirements under state and federal law that would govern such actions are unclear.  It would be incumbent on the reorganized TSC entities to navigate, and the Bankruptcy Court to oversee, this unwieldy process, with little or no precedent or guidelines.  This would be a costly, time-intensive process that would create significant ambiguity as to, and could even jeopardize, the legal status, rights and duties of the reorganized TSC entities and their stakeholders.

Second, the financial impact on the TSC Debtors' estate of unwinding the Plan would be profound.  The advisors and employees of the TSC Debtors worked many hours, at significant expense, to accomplish the Restructuring Transactions; reversal of these transactions and effectuation of some alternate plan, would be even more labor-intensive and costly.  *See In re Charter*, 691 F.3d at 485 (noting that the court "must also consider the heavy transactional costs associated with the monetary relief [appellants] seek").

Third, unwinding the Plan would entail cancellation of the New Common Stock and reinstatement of the common and preferred stock of the pre-Effective Date TSC Debtors.  The rights of the holders of Series A and B preferred stock to claim New Common Stock, which vested on the Effective Date, would also be nullified.  It is not clear whether or how this could be accomplished, in part because the shares of publicly traded TSC are held in street name, and the TSC Debtors are not privy to the identity of all of the beneficial owners of the holders of the preferred and common stock of pre-Effective Date TSC.

Fourth, Reorganized TSC would have to repay more than $27 million loaned under the Exit Facility.  To do so, Reorganized TSC would have to attempt to claw back cash distributions it has made to creditors pursuant to the Plan, including approximately $4.5 million paid to satisfy the Bridge Loan (or the Bridge Loan would have to somehow be reinstated).  These transactions would undoubtedly be heavily contested by such creditors.

Fifth, the terms and amount of the Exit Facility, which allowed the TSC Debtors to emerge from bankruptcy, were the subject of heavy negotiations.  Should the Exit Facility be unwound, there is no assurance that the Exit Facility lenders would fund the TSC Debtors' emergence from bankruptcy under different circumstances.

Sixth, unwinding the Plan could cause the TSC Debtors' reorganization to be converted to a liquidation because the TSC Debtors could be left without funding to proceed with the

16

reorganization process.  Specifically, although the TSC Debtors were able to procure DIP financing

of approximately $13.4 million, if the Plan was unwound, there is no assurance that the TSC

Debtors could secure new DIP financing, thereby resulting in a potential liquidation.

Seventh, reversal of the Confirmation Order would void releases that were essential to the

Plan.  Specifically, the TSC Debtors and the holders of claims and equity interests in the TSC

Debtors released the lenders under the Bridge Loan, the holders of Series A and B preferred shares,

the TSC Debtors and their employees and advisors, among others (the "Released Parties"), from

liability from for certain claims arising out of any occurrence taking place before the Effective

Date.  The Released Parties, in exchange, agreed to facilitate the reorganization of the TSC Debtors

and the transactions contemplated by the Plan.  To void those releases now and expose the Released

Parties to the risk of liability would impose significant harm on the Released Parties, who relied on

the releases in good faith in connection with the implementation of the Plan.

Because the relief Appellant seeks would unravel intricate transactions, create an

unmanageable situation for the Bankruptcy Court, and jeopardize the TSC Debtors' emergence

from chapter 11, Appellant cannot meet the first through third *Chateaugay* factors, and the appeal is

thus equitably moot.

### 3.    Appellant Did Not Provide Notice of the Appeal to the Parties that Would be Adversely Affected.

Appellant has not provided any evidence that he provided notice of the appeal to parties that

would be adversely affected by the appeal.  Rather, Appellant has presented evidence with respect

to his efforts to provide notice to potentially adversely affected parties, as required under

*Chateaugay*.  Examiner Appeal, Docket No. 24.  Specifically, Appellant contended:  (1) that

interested parties received notice via a bankruptcy website and the TSC Debtors' claims agent; and

(2) certain parties *must* be aware of the appeal, based on Appellant's unsupported theory that these

parties controlled the bankruptcy. *Id.*, ¶¶ 4, 5. The TSC Debtors dispute these theories and assert that neither method constitutes proper notice. Appellant thus not only did not provide notice to all parties that might be adversely affected by the appeal, he did not provide proper notice to *any* party.

      **4.**    **Appellant Did Not Diligently Pursue All Available Remedies to Obtain a Stay of Execution of the Plan.**

Under *Chateaugay*, a "chief consideration" is "whether appellant sought to stay confirmation." *In re Metromedia*, 416 F.3d at 144. A failure to seek a stay, with the result that the reorganization is substantially consummated, in particular lends itself to a finding that an appeal is moot." *In re Calpine*, 390 B.R. at 517. Here, Appellant did not move to stay the Confirmation Order. Therefore, he cannot be considered to have "diligently pursued" all available remedies to obtain a stay of the execution of the Plan.

In sum, Appellant cannot meet any of the five *Chateaugay* factors. Therefore, the appeal must be dismissed.

## II.    THE APPEAL SHOULD BE DISMISSED ON THE MERITS

Even if the Court finds that the instant appeal is not moot, the appeal should be dismissed because the Bankruptcy Court correctly applied the law and exercised its discretion, ***twice***, in deciding that appointment of an examiner was not appropriate in this case.

### A.    Standard of Review

A district court deciding an appeal of a bankruptcy court order reviews the bankruptcy court's findings of fact under a "clearly erroneous standard" and its conclusions of law *de novo*. *In re Adelphia Comm'ns Corp.*, 342 B.R. 122, 126 (S.D.N.Y. 2006); Fed. R. Bankr. Pr. 8013. The district court must give "due regard" to the bankruptcy court's opportunity to judge the credibility of witnesses." Fed. R. Bankr. P. 8013. Further, "[m]atters left to the court's discretion are reviewed for abuse of discretion." *Adelphia*, 342 B.R. at 126.

**B.      Appellant Improperly Raises Arguments for the First Time on Appeal.**

In his appellate brief, Appellant argues, for the first time, that the Confirmation Order must be reversed because the Plan does not meet the requirements of Bankruptcy Code section 1129. Appellant made no such arguments in his Plan objections or at the Confirmation Hearing and cannot raise them now, for the first time, on appeal.  *In re McKenna*, 238 F.3d 186, 187 (2d Cir. 2001) (finding that appellant waived argument raised for the first time on appeal by not presenting it to the lower court); *In re Lehman Bros. Holdings, Inc*., No. 12-cv-5621 (GBD), 2013 WL 820243, at *2 (S.D.N.Y. Mar. 5, 2013) (same).  On this basis alone, all of Appellant's arguments with respect to Bankruptcy Code section 1129—that is to say, all of the arguments in his appeal brief—were waived and should be dismissed.

Even setting aside that Appellant's new arguments with respect to Bankruptcy Code section 1129 are improper, the substance of these arguments consists of the same assertions discussed above.  These are issues that the Bankruptcy Court previously considered, and Appellant offers nothing to suggest that the Bankruptcy Court abused its discretion.  Moreover, the appointment of an examiner was the subject of Appellant's Examiner Appeal, which was dismissed as equitably moot.

**C.      The Bankruptcy Court Did Not Err in Confirming the Plan.**

**1.      Appellant Provides No Basis for His Argument the Plan was Not Proposed in Good Faith, Pursuant to Bankruptcy Code Section 1129(a)(3).**

Bankruptcy Code section 1129(a)(3) provides that the court may confirm a plan only if it has been proposed in good faith and not by any means forbidden by law.  Courts in the Second Circuit will find a plan to be proposed in good faith if it "was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected."  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (affirming confirmation where the company "honestly believed that it was in need of reorganization" and plan was proposed "with the intention

of accomplishing a successful reorganization"); *see also In re Gaston & Snow*, Nos. 93-cv-8517, 8528 (JGK), 1996 WL 694421, at *9 (S.D.N.Y. Dec. 4, 1996) (noting that a plan is not proposed in good faith where "not proposed with honesty, good intentions, and to effectuate the reorganization of the enterprise, but rather for some other motive.").

Here, Appellant does not argue that the TSC Debtors:  (1) did not honestly believe that the company was in need of reorganization; (2) did not realistically expect that a successful reorganization could be effected via the Plan; (3) had some other motive, besides the reorganization of the enterprise, for proposing the Plan; or (4) proposed the Plan in a manner prohibited by law. Rather, Appellant's argument is that the Plan improperly valued the TSC Debtors' assets and that the Bankruptcy Court did not order an independent examination of such value or of certain allegations of misconduct.  Setting aside that the Bankruptcy Court rejected these arguments on multiple occasions, neither of these arguments is a basis for a finding that the Plan was not proposed in good faith.  Accordingly, the Bankruptcy Court properly found that the Plan was proposed in good faith.

> **2.      The Plan Satisfies the Best Interest of Creditors Test of Bankruptcy Code Section 1129(a)(7).**

Under section 1129(a)(7), for a plan to be approved, each holder of a claim or equity interest must either:  (a) accept the plan; or (b)  receive or retain value under the plan that is not less than the amount such holder would receive if the debtor were liquidated in a hypothetical chapter 7 proceeding; this is commonly referred to as the "best interests test."

Appellant argues that the Plan did not satisfy the "best interests test" because the TSC Debtors' Liquidation Analysis was "tenuous."  Appellate Br. at 15.  However, Appellant puts forth no evidence to contradict the Liquidation Analysis.  Accordingly, the Bankruptcy Court properly found that the Plan satisfied the best interests test of section 1129(a)(7).

**3.** **The Requirement That at Least One Impaired Class Vote for the Plan Under Bankruptcy Code Section 1129(A)(10) Was Met.**

Appellant asserts that the Plan did not meet the requirement of Bankruptcy Code section 1129(a)(10) that at least one impaired class vote to accept the plan because certain of the impaired classes that voted in favor of the plan—Classes 3a and 3b, the Bridge Loan Claims[11] against TSC and TerreStar Holdings Inc., respectively, and Class 4a, general unsecured claims against TSC— either (a) were "artificially impaired" by the TSC Debtors or (b) should be disregarded based upon the insider status of the holders in such class.

i.     **Bridge Loan Claims**

With respect to the two classes of Bridge Loan Claims, Appellant argues that the Bridge Loan Lenders' votes should be disregarded because such classes were ***artificially*** impaired (rather than ***truly*** impaired) because the Plan provided that such loan would be repaid in full, less only default interest, which the TSC Debtors had the funds to pay during the course of their chapter 11 cases.  First, contrary to Appellant's assertions, the Bankruptcy Code does ***not*** require a debtor to use its funds to unimpair certain classes; rather, it is within the debtor's discretion to emerge from bankruptcy according to its own business judgment. [12]

Moreover, as discussed in detail in *TSC Debtors' Reply to the Objections to the TSC Debtors' Proposed Disclosure Statement* [Bankr. Docket No. 321] (the "Disclosure Statement Reply"), the TSC Debtors entered into the Bridge Loan Agreement prior to their bankruptcy filing

---

[11] As used in the Plan, "Bridge Loan Claims" are claims based upon that certain Term Loan Credit Agreement, dated as of November 19, 2010, among TSC, as borrower, TerreStar Holdings Inc., as guarantor, the lenders party thereto and the agent thereunder (the "Bridge Loan Agreement").  The holders of Bridge Loan Claims are referred to herein as "Bridge Loan Lenders."

[12] *See In re Patrician St. Joseph Partners Ltd. P'ship*, 169 B.R. 669, 678 (D. Ariz. 1994) ("it is not the court's role to ask whether alternative payment structures could produce a different scenario in regard to impairment of classes; nor does the Code require that a plan proponent use all efforts to create unimpaired classes"); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 240 (Bankr. D.N.J. 2000) ("Under the statutory scheme for the classification and treatment of claims, a plan proponent may impair a class of claims.  If an impaired class accepts the plan, the requirement of section 1129(a)(10) is satisfied."); *In re Duval Manor Assocs.*, 191 B.R. 622, 628 (Bankr. E.D. Pa. 1996) (concluding that "artificial" impairment is clearly permitted under the plain meaning of section 1129(a)(10)).

to meet expenses in connection with negotiating a consensual restructuring with their major stakeholders and to satisfy professional fees incurred therein.  *See* Disclosure Statement, § IV.D(i); Disclosure Statement Reply at 22-23.  The impairment of the Bridge Loan Claims represents a settlement reached by the TSC Debtors and the Bridge Loan Lenders in connection with the consensual restructuring contemplated by the Plan.

Appellant also asserts that the votes of the Bridge Loan Lenders should be disregarded because such lenders are "persons in control of" the TSC Debtors, and therefore insiders within Bankruptcy Code section 101(31)(B)(iii).  While the Bankruptcy Code does not define this term, courts have identified several factors as indicative of a person in control:  (i) the creditor has a "stranglehold" over the debtor, such that the debtor cannot act independently;[13] (ii) the creditor has actual management control over the debtor's day-to-day business operations, the debtor's, accounts, corporate policy, disposition of corporate assets, and determination of which creditors will be paid;[14] and (iii) the creditor has complete domination over the debtor, which renders the debtor an alter-ego of the creditor.[15]  Although the Bridge Loan Lenders had a relationship with the TSC Debtors in their capacity as a major stakeholder, Appellant offers no facts suggesting that the relationship rose anywhere near control over the TSC Debtors that would warrant insider status. Nor does the record reflect any facts suggesting that the TSC Debtors were obligated to submit to the domination of the Bridge Loan Lenders or substitute the Bridge Loan Lenders' wishes for the TSC Debtors' own business judgment, which is the principle section 101(31)(B)(iii) seeks to

---

[13] *In re UVAS Farming Corp.*, 89 B.R. 889, 893 (Bankr. D.N.M. 1988).

[14] *See In re Fort Ann Express, Inc.*, 226 B.R. 746, 755-56 (Bankr. N.D.N.Y. 1998); *In re Chas. P. Young Co.,* 145 B.R. 131, 137 (Bankr. S.D.N.Y. 1992) ("Actual management means controlling such things as debtor's personnel or contract decisions, production schedules, and accounts payable.") (citing *In re Tech. for Energy Corp.,* 56 B.R. 307 (Bankr. E.D. Tenn. 1985)); *see also In re S. Beach Sec. Inc.,* 376 B.R. 881, 888 (Bankr. N.D. Ill. 2007) (finding that to be an insider, a person must "exercise sufficient authority to 'dictate' corporate policy and the disposition of corporate assets," or actually manage the debtor) (citing *In re Badger Freightways, Inc.*, 106 B.R. 971, 982 (Bankr. N.D. Ill. 1989)).

[15] *In re A. Tarricone, Inc.*, 286 B.R. 256, 266 (Bankr. S.D.N.Y. 2002).

enforce.  Further, the TSC Debtors acted to preserve their independence in the bankruptcy proceedings.  At the beginning of the chapter 11 cases, the TSC Debtors sought post-petition financing from a third party (rather than enter into a new financing agreement with the Bridge Loan Lenders) because they believed that the degree of control that the Bridge Loan Lenders sought over the TSC Debtors' cases in their capacity as DIP lenders could interfere with the TSC Debtors' exercise of their fiduciary duties.  Ultimately, the TSC Debtors and the Bridge Loan Lenders were able to negotiate financing on less restrictive terms that were acceptable to the TSC Debtors.  *See* Second Amended Disclosure Statement, Bankr. Docket No. 338 at 28, n.23.  Accordingly, Appellant's allegations that the Bridge Lenders were "persons in control of" the TSC Debtors are unfounded.

### ii.    **TSC General Unsecured Claims**

Appellant argues that Class 4a was artificially created because (a) the TSC Debtors' settlement with Elektrobit mooted any potential objection by Elektrobit, (b) the TSC Debtors created a separate convenience class, which the Plan rendered unimpaired and paid in full and (c) the only creditor in Class 4a after the Elektrobit settlement, Van Vlissingen and Co. ("Van Vlissingen"), would receive either a note in the full amount of its claim or cash.

As a preliminary matter, because Classes 3a and 3b were impaired and voted to accept the Plan, the requirements of section 1129(a)(10) have been met and this argument is moot. Nevertheless, Class 4a is also an impaired accepting class.  First, the Bankruptcy Court held that the Elektrobit settlement was proper because, among other things, Elektrobit opted to receive 49 cents on the dollar per the settlement while the Plan proposed to satisfy other unsecured creditors in full, either through cash or notes.  Notably, the Bankruptcy Court overruled the objection of Van Vlissingen in opposing the settlement on this basis.  *See* Aug. 23, 2012 H'rg Tr., at 71-72.  Second, Bankruptcy Code section 1122(b) specifically authorizes a plan proponent to create a separate class

23

of unsecured claims under a designated threshold amount for purposes of administrative convenience.  11 U.S.C. § 1122(b).  Finally, Van Vlissingen's claim was impaired because, at the sole discretion of the TSC Debtors, such claims would be satisfied through notes to be paid over time rather than payment in cash in full.  As such parties would assume the risk of the TSC Debtors' future default under such notes, such claims were impaired and entitled to vote on the Plan.  *See, e.g., In re Village at Camp Bowie I, L.P.*, 710 F.3d 239, 245-46 (5th Cir. 2013) ("[A]ny alteration of a creditor's rights, no matter how minor, constitutes 'impairment.'") (citing *In re Windsor on the River Assocs.*, 7 F.3d 127, 130 (8th Cir. 1993)).  For all of these reasons, the Bankruptcy Court properly found that the Plan satisfied section 1129(a)(10).

**4.      The Plan Meets the Requirements of Bankruptcy Code Section 1129(b) that the Plan Be Fair and Equitable and Not Unfairly Discriminate.**

Courts within the Second Circuit have held that a plan unfairly discriminates for purposes of section 1129(b) "where similarly situated classes are treated differently without a reasonable basis for the disparate treatment."[16]  Holders of equity interests in Class 9a, including Appellant, are not entitled to a distribution under the Plan, while certain other classes of claims and equity interests are entitled to a distribution.  However, the classes receiving a recovery under the Plan are not "similarly situated" to Class 9a, but rather are higher in priority than Class 9a, and therefore such "disparate treatment" is not only reasonable, it is necessary.  Accordingly, the Plan does not unfairly discriminate against Class 9a (or any other class).

---

[16] *See In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003) (requiring a reasonable basis to justify disparate treatment of similarly situated classes); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (courts assess whether "(i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale," but also noting that the second prong, assessing whether the debtor cannot consummate the plan without discrimination, is not dispositive of the question of unfair discrimination).

Further, the Plan is fair and equitable within the meaning of Bankruptcy Code section 1129(b)(2) because (a) no class junior to Class 9a will receive any recovery under the Plan and (b) no class higher in priority to Class 9a will receive more than a 100% recovery on account of their claims or interests.

Appellant argues that because the TSC Debtors' did not result in a recovery to common equity holders, the Plan must not have been fair and equitable.  This argument is addressed above. Accordingly, Appellant has not produced any evidence sufficient to justify overturning the Confirmation Order.

**CONCLUSION**

For the reasons set forth above, the TSC Debtors respectfully request that this Court dismiss this appeal with prejudice.

New York, New York
Dated:  June 17, 2013

/s/ Joseph L. Sorkin
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis
Joseph L. Sorkin

1700 Pacific Avenue, Suite 4100
Dallas, Texas  75201
(214) 969-2800 (Telephone)
(214) 969-4343 (Facsimile)
Sarah Link Schultz

Counsel to Appellees-Debtors TerreStar Corp., et al.

26